SLR:LDM:ABK
F. # 2013V01125

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                       Plaintiff,

              -against-

ONE MILLION ONE HUNDRED SIXTY-EIGHT
THOUSAND NINE HUNDRED TWENTY-ONE DOLLARS
AND NO CENTS ($1,168,921.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
MAY 15, 2013, FROM THE PREMISES LOCATED AT 12648
WHISPER TRACE DRIVE, OCEAN CITY, MARYLAND
21842, AND ALL PROCEEDS TRACEABLE THERETO;

ONE HUNDRED TWELVE THOUSAND NINE HUNDRED
EIGHTY DOLLARS AND NO CENTS ($112,980.00) IN
UNITED STATES CURRENCY, MORE OR LESS, SEIZED
ON OR ABOUT MAY 15, 2013, FROM THE INTERIOR OF
A 2012 CHRYSLER 300M LOCATED ON OR NEAR THE
PREMISES LOCATED AT 12648 WHISPER TRACE DRIVE,
OCEAN CITY, MARYLAND 21842, AND ALL PROCEEDS
TRACEABLE THERETO;

NINE THOUSAND FOUR HUNDRED FIFTY-FIVE
DOLLARS AND NO CENTS ($9,455.00) IN UNITED
STATES CURRENCY, MORE OR LESS, SEIZED ON OR
ABOUT MAY 15, 2013, FROM THE PREMISES LOCATED
AT 2705 PHILADELPHIA AVENUE, OCEAN CITY,
MARYLAND 21842, AND ALL PROCEEDS TRACEABLE
THERETO;

SIX THOUSAND SIX HUNDRED SIXTY-SEVEN
DOLLARS AND EIGHTY CENTS ($6,667.80) IN UNITED
STATES CURRENCY, MORE OR LESS, SEIZED ON OR
ABOUT MAY 15, 2013, FROM HEBRON SAVINGS BANK
ACCOUNT NO. 1100088401 HELD IN THE NAME OF
AND/OR FOR THE BENEFIT OF CHEERS INC., D/B/A
"FIRST STOP/LAST STOP", AND ALL PROCEEDS
TRACEABLE THERETO;

**VERIFIED
COMPLAINT IN REM**

Civil Action No.

SIX THOUSAND SIX HUNDRED SIXTY-SEVEN
DOLLARS AND SEVENTY-EIGHT CENTS ($6,667.78) IN
UNITED STATES CURRENCY, MORE OR LESS, SEIZED
ON OR ABOUT MAY 15, 2013, FROM HEBRON SAVINGS
BANK ACCOUNT NO. 1100089201 HELD IN THE NAME
OF AND/OR FOR THE BENEFIT OF SWTC, INC., AND
ALL PROCEEDS TRACEABLE THERETO, and

SEVEN THOUSAND SIX HUNDRED FORTY-EIGHT
DOLLARS AND NO CENTS IN UNITED STATES
CURRENCY ($7,648.00), MORE OR LESS, SEIZED ON OR
ABOUT MAY 15, 2013 FROM THE PREMISES LOCATED
AT 309 70TH STREET, GUTTENBERG, NEW JERSEY
07093, AND ALL PROCEEDS TRACEABLE THERETO,

Defendants *In Rem*.

Plaintiff, UNITED STATES OF AMERICA, by its attorney LORETTA E.

LYNCH, United States Attorney for the Eastern District of New York, AMEET B.

KABRAWALA, Assistant United States Attorney, of counsel, for its verified complaint *in rem*,

hereby alleges, upon information and belief as follows.

## NATURE OF THE CASE

1.      This is an *in rem* civil forfeiture action to condemn and forfeit to the

exclusive use and benefit of plaintiff, United States of America, the above-captioned defendants

*in rem*, and all proceeds traceable thereto (collectively, the "Defendant Assets"), as (i) property

involved in violations of 18 U.S.C. § 1956 (relating to the laundering of monetary instruments)

and 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from

specified unlawful activity), and therefore subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A); (ii) proceeds traceable to violations of 18 U.S.C. § 2342 (relating to trafficking of

contraband cigarettes), and therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C);

and/or (iii) property involved in violations of 31 U.S.C. § 5324 (relating to evasion of reporting

of certain currency transactions), and therefore subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(2).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395 in that the acts or omissions giving rise to the forfeitures occurred within this District.

## THE DEFENDANT ASSETS

4.      The Defendant Assets consist of the following:

a.      One million one hundred sixty-eight thousand nine hundred twenty-one dollars and no cents ($1,168,921.00) in United States currency, more or less, seized on or about May 15, 2013, from the premises located at 12648 Whisper Trace Drive, Ocean City, Maryland 21842 (the "Ramadan Residence"), and all proceeds traceable thereto;

b.      One hundred twelve thousand nine hundred eighty dollars and no cents ($112,980.00) in United States currency, more or less, seized on or about May 15, 2013, from the interior of a 2012 Chrysler 300M located on or near the premises located at 12648 Whisper Trace Drive, Ocean City, Maryland 21842, and all proceeds traceable thereto;

c.      Nine thousand four hundred fifty-five dollars and no cents ($9,455.00) in United States currency, more or less, seized on or about May 15, 2013, from the premises located at 2705 Philadelphia Avenue, Ocean City, Maryland 21842 (the "Office"), and all proceeds traceable thereto;

d.   Six thousand six hundred sixty-seven dollars and eighty cents ($6,667.80) in United States currency, more or less, seized on or about May 15, 2013, from Hebron Savings Bank Account No. 1100088401 held in the name of and/or for the benefit of Cheers Inc., d/b/a "First Stop/Last Stop", and all proceeds traceable thereto;

e.   Six thousand six hundred sixty-seven dollars and seventy-eight cents ($6,667.78) in United States currency, more or less, seized on or about May 15, 2013, from Hebron Savings Bank Account No. 1100089201 held in the name of and/or for the benefit of SWTC, Inc., and all proceeds traceable thereto; and

f.   Seven thousand six hundred forty-eight dollars and no cents ($7,648.00) in United States currency, more or less, seized on or about May 15, 2013, from the premises located at 309 70th Street, Guttenberg, New Jersey 07093, and all proceeds traceable thereto.

## STATUTORY BACKGROUND

**A.  Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)**

5.       Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, "involved in" a violation, *inter alia*, of 18 U.S.C. §§ 1956 and 1957, and any property traceable to such property, is subject to forfeiture.

6.       In turn, 18 U.S.C. § 1956 criminalizes, among other things, conducting a financial transaction involving the proceeds of specified unlawful activity.

7.       Further, 18 U.S.C. § 1957 criminalizes, among other things, engaging in certain monetary transactions in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity.

8.      Specified unlawful activity includes "any act or activity constituting an offense listed in" 18 U.S.C. § 1961(1) which, in turn, includes violations of 18 U.S.C. §§ 2341-2346 (relating to trafficking of contraband cigarettes).

**B.  Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(C)**

9.      Title 18 U.S.C. § 981(a)(1)(C) provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity', or a conspiracy to commit such offense" is subject to forfeiture to the United States.

10.     Title 18 U.S.C. § 2342(a) provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes.  For purposes of Section 2342, the term "contraband cigarettes" includes a quantity in excess of 10,000 cigarettes which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found.

11.     In turn, New York Tax Law ("NYTL") § 471(1) imposes a tax on "all cigarettes" possessed for sale or use in New York State, except for those cigarettes that New York is "without power" to tax.  Under NYTL § 471(1), all cigarettes are presumed taxable "until the contrary is established."

12.     Further, NYTL § 471(2) sets forth the mechanism through which New York collects taxes on all cigarettes that the State has the power to tax.  Under NYTL § 471(2), an "agent" advances money to the State in return for tax stamps, which the agent subsequently applies to each carton of cigarettes in his or her possession.  The agent then adds the cost of the tax onto the cigarettes he or she whole sells to retailers who, in turn, pass the tax on to consumers through mark-ups over the cigarette manufacturers' suggested retail prices.

5

13.     In addition, under NYTL § 1814(c)(1), "[a]ny person, other than an agent licensed by the commissioner, who willfully possesses or transports for the purpose of sale ten thousand or more cigarettes subject to the tax imposed by section four hundred seventy-one of [the NYTL] in any unstamped or unlawfully stamped packages or who willfully sells or offers for sale ten thousand or more cigarettes in any unstamped or unlawfully stamped packages . . . shall be guilty of a class E felony."

14.     Moreover, Title 30 Delaware Code § 5306 mandates that a "tax shall be paid and the stamp shall be affixed by the first person who has possession of tobacco products[.]"  Title 30 Delaware Code § 5307 provides that "[n]o person shall engage in or conduct the business of manufacturing, purchasing, selling, consigning or distributing tobacco products in this State or acting as an affixing agent without having first obtained the appropriate license or licenses for that purpose as prescribed by this chapter."  Under Title 30 Delaware Code § 5315, "every authorized affixing agent shall affix to each pack of tobacco products received by the agent and shall cancel Delaware tobacco product tax stamps to evidence payment of the tax imposed by this chapter, unless such stamps have been affixed to the packs of tobacco products and cancelled before such authorized affixing agent received them."

**C.  Forfeiture Pursuant to 31 U.S.C. § 5317(c)(2)**

15.     Pursuant to 31 U.S.C. § 5317(c)(2), any property involved in a violation of 31 U.S.C. § 5324, or any conspiracy to commit such offense, and any property traceable to any such property, is subject to civil forfeiture.

16.     In turn, 31 U.S.C. § 5324(b) provides that "[n]o person shall, for the purpose of evading the report requirements of section 5331 or any regulation prescribed under such section — (1) cause or attempt to cause a nonfinancial trade or business to fail to file a

report required under section 5331 or any regulation prescribed under such section; (2) cause or attempt to cause a nonfinancial trade or business to file a report required under section 5331 or any regulation prescribed under such section that contains a material omission or misstatement of fact . . . ."

17.     Title 31 U.S.C. § 5331(a), entitled "Reports relating to coins and currency received in nonfinancial trade or business[,]" requires non-financial trades or businesses to file a form (entitled Form 8300) with the Financial Crimes Enforcement Network ("FinCEN") when a non-financial trade or business receives currency in excess of $10,000 in a transaction occurring on or after January l, 2002.  A non-financial trade or business is a business other than a "financial institution" that receives cash transactions from customers for services or products rendered.

18.     Pursuant to 31 U.S.C. § 5331 and 31 C.F.R. § 103.30, when a non-financial trade or business receives more than $10,000 in currency in one transaction or two or more "related transactions," it must file a Form 8300 within fifteen days from the date of the payment that caused the amount to exceed $10,000.  Under 31 C.F.R. § 103.30(c)(12)(ii), "related transactions" are any transactions between a payer and a recipient of currency in a 24-hour period, or transactions between a payer and a currency recipient during a period of more than 24 hours if the recipient knows or has reason to know that each transaction is one of a series of connected transactions.

**D.  Forfeiture of Fungible Property**

19.     Pursuant to 18 U.S.C. § 984, in any *in rem* forfeiture action in which the subject property is cash or funds deposited into a bank account, the Government is not required to identify the particular funds involved in the offense; any funds found in the same account within one year of the date of the offense are subject to forfeiture.

## GENERAL BACKGROUND ON CONTRABAND
## CIGARETTE TRAFFICKING ENTERPRISES

20.     Generally, a contraband cigarette trafficking enterprise is comprised of a group of persons sharing the common purpose of engaging in, and profiting from, the transportation, possession, and/or sale of contraband cigarettes.  It has an ascertainable structure, a continuity of existence, and a criminal purpose beyond the scope of the individual acts of transporting, possessing selling, and/or accepting contraband cigarettes.  Contraband cigarette trafficking enterprises generally function as follows:

a.      At the top of the contraband cigarette trafficking enterprise is the "boss," who directs the operation of the enterprise, and procures and stores the contraband cigarettes. Depending on the tax laws in the state that serves as the base of operations, the boss may either acquire the cigarettes from an authorized wholesaler in a jurisdiction with low cigarette taxes and distribute contraband cigarettes in a higher tax jurisdiction, or he may acquire the cigarettes in another manner so as to evade the local cigarette tax and/or any taxes in the jurisdiction where the contraband cigarettes are ultimately distributed.  Either way, the boss is not authorized by State law to possess, transport, or distribute cigarettes in the jurisdiction in which the enterprise sells its contraband cigarettes.  The boss may be assisted by other individuals in the administration of these functions, as well as in the handling of the finances of the illegal enterprise.  There may be a trusted lieutenant or "second-in-command" who assumes the boss's role when he is unavailable.  In addition to controlling the price of the contraband cigarettes paid to him by the distributors, the boss will determine if credit will be extended for merchandise and, if so, under what terms.  The boss may also determine the geographic markets serviced by the distributors and the manner in which they will transport, store and distribute the merchandise.

b.      The individuals who work under the boss are known as "distributors."

The distributors pay the boss for the contraband cigarettes and cause the merchandise to be covertly transported from the boss' storage location to resellers in the ultimate market.  The distributors are not lawfully authorized to possess, transport, or distribute cigarettes in the jurisdiction in which the enterprise sells its contraband cigarettes.

        c.      The distributors may utilize one or more "transporters," who bring the cash payments for past balances on merchandise to the boss and ferry the contraband cigarettes from the boss's storage location to the distributors.  The transporters are not lawfully authorized to possess, transport, or distribute cigarettes in the jurisdiction in which the enterprise sells its contraband cigarettes.

        d.      The "resellers" are individuals who pay the distributors for contraband cigarettes, and usually receive the merchandise from the transporter and sell the contraband cigarettes to the ultimate merchants, who are usually grocery store owners.  The resellers are not lawfully authorized to possess, transport, or distribute cigarettes in the jurisdiction in which the enterprise sells its contraband cigarettes.

        21.      Persons involved in contraband cigarette trafficking tend to employ certain methods of operation, including the following:

        a.      Bosses often utilize a large, non-descript storage or warehouse facility with a loading bay or garage capable of parking a delivery vehicle (van, box truck, sport utility vehicle, etc.), so that contraband cigarettes may be loaded without detection by law enforcement or the general public.  This includes the delivery of contraband cigarettes from a cooperating wholesaler, either with or without the wholesaler's knowledge of a boss' pervasive evasion of the cigarette tax in the jurisdiction where the contraband cigarettes are ultimately distributed.

        b.      Distributors place orders with the boss, or someone working for the boss,

often using established coded language for the quantities and brands of contraband cigarettes. Each carton contains ten packs of cigarettes, for a total of 200 individual cigarettes.

        c.      Distributors and their transporters frequently utilize box trucks, vans and large sport utility vehicles in order to transport the contraband.  These vehicles are frequently rented, or otherwise registered by third parties, so as to prevent detection of the distributors and transporters by law enforcement officials.

        d.      Bosses, distributors and resellers will frequently use sham businesses and bank accounts associated therewith to launder proceeds of their crimes and/or to facilitate their criminal activity.

        22.      It is common in contraband trafficking operations for transactions to be performed only in cash, so as to avoid evidence of tax liability for merchandise, especially when dealing with heavily regulated goods such as cigarettes, which require state licensing to transport and sell.

## THE INVESTIGATION

        23.      Beginning in or about June 2012, the New York City Police Department, the New York State Attorney General's Organized Crime Task Force, and later the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, conducted an investigation into a contraband cigarette trafficking and money laundering enterprise (the "Enterprise") operating in and around Kings, Albany, and Schenectady counties and elsewhere in the State of New York, as well as in Delaware, Maryland, Virginia, and New Jersey.

        24.      The Enterprise funneled into New York—including Brooklyn—large quantities of contraband cigarettes from storage locations in Delaware, in violation of federal

criminal laws, including but not limited to, 18 U.S.C. § 2342, which makes it unlawful to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes.

25.     The investigative team employed the use of physical surveillance, video camera surveillance, court-approved electronic eavesdropping, lawfully-issued and executed search warrants, and the use of other investigative techniques.

26.     As a result of the investigation, numerous participants in the Enterprise, including the following individuals, were charged as defendants in a 244-count indictment filed in the Supreme Court for the State of New York, Kings County, Index No. 3592/2013 (the "Indictment"):  Basel Ramadan, a/k/a Abu Salah; Samer Ramadan, a/k/a Abu Mahdy; Adela Buzahrieh, a/k.a Adel Abuzarieh; Yousseff Odeh, a/k/a Abu Mahmoud; Issa Sulieman; Mufeed Attal, a/k/a Abu Saleem; Izzat Nimer, a/k/a Nimer Izzat and Abu Ali; Munther Mahmoud; Nabiel Saad Badr, a/k/a Abu Nabil; Ahmad Abdelaziz, a/k/a Al Jaba'I; Ribhi Awawdeh; Mohamed Abed Alabed Awawdeh, a/k/a Abu Samir; Bassam Twam; Murad Bishrat, Mohannad Seif; and Muaffaq Askar (collectively, the "defendants").

27.     According to the Indictment, and as the investigation revealed, Basel Ramadan was the "boss" of the Enterprise.  He acquired cigarettes for distribution in New York, storing those cigarettes in Delaware, and controlling the distribution of cigarettes to the New York City area without paying New York State tobacco taxes and thereby generating millions of dollars in illicit proceeds for himself and other members of the Enterprise.

28.     As charged in the Indictment, and as the investigation revealed, Basel Ramadan's brother, Samer Ramadan, served as a treasurer for the Enterprise and assisted Basel Ramadan in all aspects of its operation, including the control and distribution of cash generated by the Enterprise.

11

29.     As charged in the Indictment, and as the investigation revealed, Youssef Odeh, Ribhi Awawdeh, Mohamed Abed Alabed Awawdeh, Ahmad Abdelaziz, Mufeed Attal, Nimer Izzat, Munther Mahmoud, and Saad Badr Nabiel were "distributors" of the Enterprise, who purchased untaxed cigarettes from Basel Ramadan using the proceeds that they generated from a prior sale of contraband cigarettes, and then distributed them within New York City—including Brooklyn—to New York-based resellers Bassam Twam, Mohannad Seif, Murad Bishrat, and Muaffaq Askar, among others, who sold contraband cigarettes to local cigarette retailers.

30.     Further, according to the Indictment, and as the investigation revealed, Adel Abuzarieh was a "transporter" who regularly transported large amounts of cash proceeds generated from the sales of contraband cigarettes, sometimes over $100,000 per trip, from New York-based distributors back to Basel Ramadan in order to replenish the cigarette supply, and transported the contraband cigarettes from Basel Ramadan's Delaware storage facilities back to the New York-based distributors for sale.

31.     As charged in the Indictment, and as the investigation revealed, Basel and Samer Ramadan purchased cigarettes from at least one wholesaler, Cooper Booth Wholesale, Inc., using their Virginia businesses as fronts to appear as though they were purchasing cigarettes for sale in Virginia, thereby paying only the low Virginia cigarette tax of approximately $0.30 per pack, and thereafter controlled the distribution of the cigarettes to the New York City area without anyone associated with the Enterprise paying New York State tobacco taxes for those cigarettes, which are approximately $4.35 per pack, or local New York City taxes, which bring the total taxes to approximately $5.35 per pack.

32.     According to the Indictment, and as the investigation revealed, Basel Ramadan determined the New York-based distributors to whom he would sell cigarettes, the prices distributors had to pay for cigarettes, and the times and locations at which the distributors would exchange money for cigarettes.

33.     The investigation also revealed that proceeds of the contraband cigarette trafficking operation were transferred between members of the Enterprise using, among other methods, by hand-to-hand exchanges of U.S. currency between members and by the deposit of U.S. currency in financial institutions.  Large quantities of U.S. currency were held by members of the Enterprise in their homes and businesses, often contained within locked containers.

34.     Further, confidential informant(s) ("CI") purchased contraband cigarettes on several different occasions in New York from members of the Enterprise at the direction of law enforcement agents, and those cartons of contraband cigarettes that were seized by members of the investigative team did not bear New York State cigarette tax stamps as required by law. For example, on various occasions during the investigation, a CI purchased 12,000 assorted cigarettes bearing Virginia tax stamps from a defendant in the Enterprise in New York.

35.     Additionally, during the course of the investigation, in or about December 2012, members of the investigative team executed a search warrant on a storage facility located in Brooklyn, New York, which was controlled by defendant Izzat Nimer.  As a result of the search, law enforcement agents seized approximately 353,000 cigarettes and 63,000 counterfeit New York and Connecticut tax stamps.

36.     None of the members of the Enterprise were licensed as affixing agents, wholesalers, or distributing agents in the states of New York or Delaware and, thus, did not have

the authority either to collect or remit cigarette tax in either New York or Delaware.  None of the defendants in the Enterprise has ever remitted such taxes.

37.     The investigation revealed that the Enterprise used, *inter alia*, two storage facilities in Delaware from which they distributed contraband cigarettes, one located at 27515 Hodges Lane, Unit #N-2, Dagsboro, Delaware (the "Dagsboro Storage Facility"), and another located at 9 Discovery Lane, Selbyville, Delaware (the "Selbyville Storage Facility").  On or about May 15, 2013, law enforcement officers searched both storage facilities pursuant to warrants issued the preceding day by the United States District Court for the District of Delaware.  Execution of the search warrant resulted in the seizure of approximately 4,500 cartons of cigarettes stored at the Dagsboro Storage Facility and approximately 6,855 cartons of cigarettes stored at Selbyville Storage Facility, comingled with evidence of contraband cigarette trafficking.

## THE DEFENDANT ASSETS

### A.  Currency Seized from the Ramadan Residence and Ramadan's Vehicle

38.     The premise located at 12648 Whisper Trace Drive, Ocean City, Maryland 21842 is Basel Ramadan's residence.  Surveillance of Basel Ramadan demonstrated that he routinely stopped at his residence after taking possession of U.S. currency at the contraband cigarette storage and distribution facilities in Delaware.

39.     For example, on or about January 8, 2013, law enforcement officers lawfully intercepted a telephone call between transporter Adel Abuzarieh ("Adel") and Basel Ramadan, in which Adel arranged for the purchase of approximately 1,500 to 1,600 cartons of contraband cigarettes for distribution to Ahmad Abdelaziz ("Abdelaziz").  In the call, Basel and Adel arranged to meet the following day.

40.     The following day, on or about January 9, 2013, law enforcement officials observed Adel leave a location in Brooklyn, New York and several hours later, observed him operating a white box truck in the vicinity of the Dagsboro Storage Facility.  Thereafter, law enforcement officers observed Adel meet with Basel Ramadan at the Dagsboro Storage Facility. Law enforcement officers then observed Ramadan exit the Dagsboro Storage Facility carrying a plastic bag, which he placed in the front seat of his vehicle.  Subsequently, Ramadan drove away from the Dagsboro Storage Facility toward the Ramadan Residence.  Upon arrival, Ramadan retrieved the plastic bag from the front seat of his vehicle and carried it into the Ramadan Residence.

41.     Later that day, on January 9, 2013, law enforcement officers observed Adel in New Jersey, where he met with Abdelaziz, with whom he had arranged to distribute contraband cigarettes purchased from Basel Ramadan.

42.     On another occasion, on or about January 15, 2013, in a lawfully intercepted telephone call between transporter Adel and distributor Ribhi Awawdeh ("Ribhi"), the two defendants discussed the procurement of cigarettes.  That same day, Adel also spoke with Abdelaziz to arrange for the purchase of cigarettes.  During that call, Adel stated to Abdelaziz, in sum and substance, that Abdelaziz owed approximately $44,480 to Basel Ramadan for cigarettes previously received from Ramadan.

43.     On the following morning, January 16, 2013, during a lawfully intercepted telephone call between Adel and Basel Ramadan, Adel stated, in sum and substance, that distributor Ribhi ordered 1,200 cartons of cigarettes, and Basel Ramadan indicated that he had only 300 cartons available but would prepare the order.  Later that morning, Ramadan arrived at the Dagsboro Storage Facility, and several minutes later, Adel arrived as well, driving a white

15

box truck.  Moments later, Adel left the Dagsboro Storage Facility in the white box truck, and

thereafter, Basel Ramadan was observed exiting the storage facility, placing a blue bag in the

trunk of his Chrysler 300M automobile registered in his name, and re-entering the storage unit.

Shortly thereafter, distributor Nimer Izzat entered the Dagsboro Storage Facility in a vehicle

rented from a location in Queens, New York.  Thereafter, Basel Ramadan was observed carrying

a dark colored plastic bag from the Dagsboro Storage Facility to the trunk of his Chrysler 300M.

After placing this second bag in the trunk of his car, Ramadan was observed driving into the

housing development where the Ramadan Residence is located.  Next, a law enforcement officer

observed Ramadan's vehicle parked in front of the Ramadan Residence.  Cellular telephone

information placed Basel Ramadan in the immediate vicinity of the Ramadan Residence.  During

a lawfully monitored telephone call that afternoon, on January 16, 2013, Basel Ramadan

discussed with Adel, in sum and substance, how much money was in the "stash" Adel received

from Abdelaziz.

     44.    On another occasion, on or about April 21, 2013, during a lawfully

intercepted and monitored telephone call between Basel Ramadan and distributor Youssef Odeh

("Odeh"), Odeh advised Ramadan to arrange an "order," to which Ramadan told Odeh, in sum

and substance, to have Odeh's "guy" pick up the order the next day between 12 and 1 p.m.

     45.    The next day, at approximately 12:38 p.m., law enforcement officers

observed a meeting between Basel Ramadan and an individual identified as A. Faidel at the

Selbyville Storage Facility.   The two men met at or in the immediate vicinity of the Selbyville

Storage Facility and, right after the meeting, Ramadan was observed at the Ramadan Residence.

Shortly thereafter, Basel Ramadan was observed at 2705 Philadelphia Avenue, Ocean City,

Maryland 21842 (the "Office"), which the investigation revealed served as a base of

administrative operations for the Enterprise.  While at the Office, Ramadan was observed

removing a dark colored bag from his vehicle, a Chrysler 300M, and entering the rear of the

building.

46.     Based on the investigation, law enforcement officers believed that Basel

Ramadan used the Ramadan Residence to store, among other things, proceeds of contraband

cigarette trafficking in the form of large quantities of U.S. currency.

47.     Basel Ramadan has not filed any Form 8300 for cash transactions in which

he received currency in excess of $10,000.

48.     On May 14, 2013, a United States Magistrate Judge for the District of

Maryland issued a warrant authorizing the search of, among other places, the Ramadan

Residence.

49.     On or about May 15, 2013, law enforcement officers lawfully searched the

Ramadan Residence pursuant to the warrant and recovered, among other things, the Defendant

Asset, approximately $1,168,921.00 in U.S. currency, concealed in various places throughout the

house, as well as a pistol, a magazine for a pistol, and ammunition.

50.     Additionally, on or about May 15, 2013, law enforcement officers

lawfully searched Basel Ramadan's vehicle, a Chrysler 300M.  During the search, law

enforcement officers recovered, among other things, the Defendant Asset, approximately

$112,980.00 in U.S. currency, together with a loaded firearm, and bank and business records.

Most of this currency was found in a large black trash bag, wrapped with black tape, on the floor

of the passenger side of the vehicle; some currency was found loose in an interior compartment

of the car.

B.  **Currency Seized from the Office**

51.     Following meetings with other co-defendants in the Enterprise, Basel Ramadan was repeatedly observed departing from Dagsboro Storage Facility and Selbyville Storage Facility, arriving at the Office, removing bags from the trunk of his vehicle, and entering the Office with the bags.

52.     Ramadan was also observed operating the Enterprise from the Office.  For example, during a lawfully intercepted telephone call on or about April 27, 2013, Ramadan and Abdelaziz discussed, in sum and substance, recordkeeping of cash paid by customers.  Ramadan noted that he was counting more than $300,000.  Additionally, on May 5, 2013, Basel Ramadan sent a text message to distributor Issa Sulieman concerning a sum of money.  About fifteen minutes later, law enforcement officers observed Basel Ramadan exit the Office with a bag and place it in his Chrysler 300M.

53.     Further, on at least one other occasion, Basel Ramadan, was observed leaving his Office with a bag and traveling directly to a bank.  For example, on or about April 15, 2013, law enforcement officers observed Ramadan at the Selbyville Storage Facility, then travel to his residence, and later enter the Office.  Several minutes after entering the Office, Ramadan was observed leaving his Office with bags.  Thereafter, he was observed traveling to the Hebron Savings Bank located at 101 North Main Street, Hebron, Maryland, carrying the same bags that he removed from his Office.  Bank records reveal that Basel Ramadan deposited approximately $372,960.00 in cash on April 15, 2013 into an account under his control.

54.     On May 14, 2013, a United States Magistrate Judge for the District of Maryland issued a warrant authorizing the search of, among other places, the Office.

55.    On or about May 15, 2013, law enforcement officers lawfully searched the Office pursuant to the warrant and recovered, among other things, the Defendant Asset, approximately $9,455.00 in U.S. currency, together with two bags of money bands, two money counters, bank deposit slips, gold coins, a pistol, a magazine for a pistol, and ammunition.

### C.  **Bank Accounts**

56.    Hebron Savings Bank ("Hebron Bank") is a financial institution with multiple locations in Maryland, including at 101 North Main Street, Hebron, Maryland 21830. Basel Ramadan maintained bank accounts at Hebron Bank for various entities listing himself as a principal, including Cheers, Inc. ("Cheers") and SWTC, Inc. ("SWTC").

### i.    **The Cheers Account**

57.    On or about October 29, 2012, Basel Ramadan opened Account No. 1100088401, held in the name and/or for the benefit of Cheers Inc., d/b/a "First Stop/Last Stop," at Hebron Bank (the "Cheers Account").  The primary signatory on the account was Basel Ramadan.

58.    Cheers is a tobacco retailer located at 6414 Lankford Highway, New Church, Virginia 23415.  At all relevant times, the location consisted of two small storefronts, which surveillance by law enforcement officers showed to have minimal business activity.  The businesses themselves are little more than trailers on the side of the road.  According to 2010 United States Census data, New Church has a population of 205.

59.    From on or about November 5, 2012 through February 29, 2013, cash deposits were made into the Cheers Account, ranging from $27,500.00 to $390,000.00 per week and, at times, on multiple occasions per week; this includes the deposit referenced in Paragraph 53, above.  Cash deposits made into the account are inconsistent with year-round geographical

sales expectations for a small-town business such as Cheers, particularly where surveillance has revealed minimal business activity.

60.     The Cheers Account was involved in, and received monies traceable to, contraband cigarette trafficking and money laundering activities.  For example, on or about February 19, 2013, an intercepted telephone call between Basel Ramadan and co-defendant Izzat Nimer ("Nimer") indicated that Basel Ramadan was preparing an order of contraband cigarettes for Nimer, who was on his way to pick up the order.  Later that morning, an intercepted telephone call between Basel Ramadan and co-defendant Ahmed Ibrahimahmed ("Ibrahimahmed") indicated that Ramadan gave Ibrahimahmed instructions to deposit funds into an account, and to advise bank employees, if questioned, that Ramadan works for an entity known as Cooper-Booth Wholesale Company.  Bank records confirm that on February 19, 2013, two over-the-counter cash deposits were made into the Cheers Account in the name of Basel Ramadan: one for $254,020 and a second deposit for $200,000.

61.     Thereafter, on March 29, 2013, Youssef Odeh ordered a quantity of contraband cigarettes from Basel Ramadan, to be picked up and delivered by Adel the following day.  On the following day, March 30, 2013, Basel Ramadan was at Dagsboro Storage Facility placing a bag in the trunk of his Chrysler 300M, with co-defendant Adel's box truck exiting that location.

62.     The next day, Basel Ramadan made a $300,000 cash deposit into the Cheers Account.

63.     On May 14, 2013, United States Magistrate Judge Marilyn D. Go of the United States District Court for the Eastern District of New York, upon the application of the United States, issued a warrant authorizing the seizure of all funds on deposit in the Cheers

20

Account, and all proceeds traceable thereto.   Law enforcement officers executed the warrant, which resulted in the seizure of the Defendant Asset, approximately $6,667.80 in U.S. currency.

### ii.    The SWTC Account

64.    On or about October 29, 2012, Basel Ramadan opened Account No. 1100089201, held in the name and/or for the benefit of SWTC, Inc. at Hebron Bank (the "SWTC Account").  The primary signatory on the account was Basel Ramadan.

65.    According to information provided to Hebron Bank by Basel Ramadan, SWTC's business address is 6758 Maddox Boulevard, Chincoteague, Virginia, which is a rural coastal town on the eastern shore of Virginia.  According to 2010 United States Census data, Chincoteague has a population of less than 3,000.

66.    SWTC is a tobacco retailer and souvenir shop.  However, surveillance at the property revealed it to be a strip mall containing three stores in total:  a Dairy Queen, a surf shop, and a beer and wine shop (the beer and wine shop also sold cigarettes).  SWTC's name appears on a door directly behind the surf shop.  Surveillance conducted on May 9, 2013, a Thursday, revealed that all three stores were closed by 6:30 p.m.  There was very little traffic activity throughout the day.

67.    From on or about November 5, 2012 through on or about April 18, 2013, cash deposits were made into the SWTC Account ranging from $88,000.00 to $301,600.00, approximately on a weekly basis and, at times, on multiple occasions per week.  Cash deposits made to the SWTC Account are inconsistent with year-round geographical sales expectations for a small, tourist-town business such as SWTC, particularly where surveillance has revealed minimal business activity.

68. The SWTC Account was involved in, and received monies traceable to, contraband cigarette trafficking and money laundering activities. For example, on February 26, 2013, distributor Ribhi Awawdeh ordered from transporter Adel Abuzarieh 2,000 cartons of contraband cigarettes for the following day. Moments later, Adel placed an order over the phone for 2,000 cartons with Basel Ramadan. The next morning, on February 27, 2013, Basel and Samer Ramadan arrived at Dagsboro Storage Facility in Basel Ramadan's Chrysler 300M. Adel later arrived with his box truck, and an hour later, Samer Ramadan placed what appeared to be a box in the back seat of Basel Ramadan's Chrysler 300M, and a bag in its trunk.

69. Later that afternoon, law enforcement officers lawfully intercepted a telephone call between Basel Ramadan and Adel, in which Basel confirmed having a total of $173,476 in cash, consisting of, among other things, one packet containing $81,520.

70. The next day, February 28, 2013, Basel Ramadan made a cash counter deposit into the SWTC Account in the amount of $256,500.00.

71. On May 14, 2013, United States Magistrate Judge Marilyn D. Go of the United States District Court for the Eastern District of New York, upon the application of the United States, issued a warrant authorizing the seizure of all funds on deposit in the Cheers Account, and all proceeds traceable thereto. Law enforcement officers executed the warrant, which resulted in the seizure of approximately $6,667.78 in U.S. currency.

**D. Currency Seized from Mohammad Abed**

72. On May 15, 2013, law enforcement agents executed an arrest warrant for defendant Mohammad Abed, who the investigation revealed was a distributor in the Enterprise.

73. On that date, law enforcement agents performed a consensual search of Abed's residence, 309 70th Street, Guttenberg, New Jersey, and recovered, among other things,

the Defendant Asset, approximately $7,648.00 in U.S. currency, together with evidence of contraband cigarette trafficking activity, including counterfeit tax stamps.

### FIRST CLAIM FOR RELIEF
**(18 U.S.C. § 981(a)(1)(A))**

74.     Plaintiff repeats and re-alleges each and every allegation set forth above as if set forth fully herein.

75.     The Defendant Assets were involved in transactions and/or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957.

76.     As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### SECOND CLAIM FOR RELIEF
**(18 U.S.C. § 981(a)(1)(C))**

77.     Plaintiff repeats and re-alleges each and every allegation set forth above as if set forth fully herein.

78.     The Defendant Assets constitute proceeds or are derived from proceeds of property traceable to violations of 18 U.S.C. §§ 1956, 1957, and 2341-2346, and/or conspiracy to commit such offenses.

79.     As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRD CLAIM FOR RELIEF
### (31 U.S.C. § 5317(c)(2))

80.    Plaintiff repeats and re-alleges each and every allegation set forth above as if set forth fully herein.

81.    The Defendant Assets were involved in violations of 31 U.S.C. § 5324(b), or used in a conspiracy to cause or attempt to cause violations of such offense.

82.    As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 31 U.S.C. § 5317(c)(2).

WHEREFORE, plaintiff, United States of America, requests that a warrant of this Court be issued for the arrest of the Defendant Assets; that due notice of these proceedings be given to all interested persons; that after further proceedings, the Defendant Assets be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action and such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      October 11, 2013

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: _____

AMEET B. KABRAWALA
Assistant U.S. Attorney
(718) 254-6001

24

## VERIFICATION

MARIA MARZAN, being duly sworn, deposes and states, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.     I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

2.     I have read the Verified Complaint *In Rem*.

3.     The matters contained in the within Verified Complaint *In Rem* are true and accurate to the best of my knowledge, information and belief.

4.     The source of my information and the grounds for my belief are information provided by other law enforcement officers involved in the investigation, and my review of records lawfully obtained by state and federal law enforcement authorities.

Dated: Brooklyn, New York
    October  11 , 2013

MARIA MARZAN
Special Agent
U.S. Department of Homeland Security
Immigration and Customs Enforcement
Homeland Security Investigations

25